. NOTE.—Syllabus by the Court.

---

## Mardo v. Valley Smokeless Coal Company.

*Negligence—Falling of a tree—Evidence as to dangerous condition of tree —Province of court and jury.*

1. In an action to recover damages for the death of plaintiff's minor son, caused by the fall of a tree, the mere fall of the tree is not in itself evidence of defendant's negligence in leaving the tree standing while in an alleged dangerous condition.

2. In such case the court may find as a matter of law that plaintiff cannot recover where the evidence of the condition of the tree was that there were some dead limbs at its top, that some roots, which were exposed six inches from its trunk, "looked like they were dead," and that the tree was otherwise apparently sound, without affirmative proof that such facts indicated that the tree might come up by its roots.

Motion for judgment *n. o. v.* and for a new trial. C. P. Cambria Co., March T., 1921, No. 32.

*Ray Patton Smith* and *William H. Burd,* for plaintiffs.

*Charles S. Evans* and *Harold B. Beitler,* for defendants.

REED, P. J., specially presiding, Aug. 15, 1922.—This is an action of trespass brought by the plaintiffs against the defendant for the purpose of recovering for the loss they sustained by reason of the death of their minor son, Mike Mardo, who was killed on Aug. 30, 1920, at or about 8.30 o'clock A. M., while in the plaintiffs' yard, near their house, by being struck by a falling tree, which had stood on plaintiffs' lot and which was knocked down by a larger tree that came up by the roots and which stood on a lot near the home of the plaintiffs. The property in which the plaintiffs resided at the time of the death of their son, and upon which the tree that struck the boy stood, was owned by the defendant and leased to the plaintiffs. The property upon which the other tree stood was also a lot of the defendant's which was not built on. The smaller tree, or the tree which struck the boy, was described in the testimony as a butternut tree, some eight or ten inches in diameter, and the larger

3 D. & C.

tree was described as a sugar maple, which was from eighteen to twenty-four inches in diameter.

The plaintiffs allege that the injuries complained of "were caused solely through the negligence of the defendant, its agents and employees, who knew, or by the exercise of reasonable diligence might have known, that the trees which caused the death of Mike Mardo were in a dangerous condition and likely to cause the injuries herein complained of. The negligence consisted of the defendant permitting to stand on the premises of the defendant, in close próximity to the plaintiffs' minor son and others lawfully upon said premises, a tree or trees whose roots had become rotten and unstable and in a dangerous condition, all of which was apparent to the defendant and had come to the knowledge of the defendant, its agents and employees."

After the plaintiffs had rested their case, counsel for defendant made a motion for a compulsory non-suit. This motion was denied and the defendant then proceeded to introduce its evidence. After all the evidence was in, counsel for the defendant asked the court to give binding instructions for the defendant, which the court refused, and the case went to the jury, with the result that a verdict was found for the plaintiffs in the sum of $3506; whereupon the defendant filed, *inter alia*, the following reasons to support its motion for judgment *n. o. v.* and for a new trial: (1) The court erred in refusing to sustain the defendant's motion for a compulsory non-suit; (2) the court erred in refusing to affirm the defendant's first point; (3) the court erred in refusing to affirm the defendant's fourth point; and (4) that the verdict was against the weight of the evidence.

This being an action of trespass for the alleged negligence of the defendant, it was incumbent upon the plaintiffs to show by competent evidence that the defendant was guilty of negligence, and that it was due to this negligence that their son was killed.

In the case of Fritsch v. City of Allegheny, 91 Pa. 226, 228, Mr. Justice Mercur, in delivering the opinion of the court, says: "Negligence is the absence of proper care, caution and diligence; of such care, caution and diligence as, under the circumstances, reasonable and ordinary prudence would require to be exercised. It may consist as well in not doing a thing which ought to be done as in doing that which ought not to be done, when in either case it has caused a loss and damage to another. Hence, in this case, one question to be determined is whether the municipality, acting through its officials, failed to exercise such care and diligence in not ascertaining the nuisance and in not removing it prior to the injury sustained by the plaintiff."

This definition of negligence was quoted with approval by Mr. Justice Gordon in the case of Kibele v. City of Philadelphia, 105 Pa. 41, and an examination of the authorities discloses the fact that the courts in almost every state of the Union, in defining negligence, have given it the same definition, although not expressing themselves in the identical language.

In this State it was held, in the case of Fitzpatrick v. Penfield, 267 Pa. 564, that "the mere happening of the accident raises no presumption of negligence. The burden of proof rests upon the plaintiff."

Starting, then, with the proposition that the killing of the boy by reason of the falling of the trees is not sufficient alone to show the negligence on the part of the defendant, it was incumbent upon the plaintiffs, before they could recover, to prove by competent evidence negligence on the part of the defendant, as it was not permissible for the jury to guess at the cause of the injury or to assume that it was something for which the defendant was responsible: Reese v. Clark, 146 Pa. 465; Direnzo v. Bridge Co., 265 Pa. 561.

Mardo *v.* Valley Smokeless Coal Company.

The plaintiffs, no doubt realizing that the burden was on them to show the negligence of the defendant, called certain witnesses, on whose testimony they relied to make out their case, and they contend that the evidence thus produced was sufficient to take the case to the jury.

It is claimed on the part of the plaintiffs that the larger tree was the one that first gave way and fell upon the smaller, which was broken down, and which, in falling, struck the boy, and that for sometime prior to the falling of this larger tree it showed certain signs of decay, which were sufficient to have given notice to an ordinary prudent man that it was in a dangerous condition, and thereby liable to fall and do injury to persons who might be near at the time.

The testimony to sustain this position is rather meagre. Mary Mardo, the mother of the deceased boy, testified, in part, as follows: "A. I don't know exactly what time. I only recollect the occasion when some trees were examined there as to their condition and were cut off because they were thought unsafe. About that time was the first time I noticed that that tree had some bare branches on it. A. About a month before the accident happened; it was when some gang of men was clearing off these trees.

"Q. Did you call their attention to this tree at that time? A. No, I didn't. Q. What did you mean when you said there were some bare branches on that tree? Did you mean away up on the top of the tree? A. Yes, on the top of the tree, the higher part of the tree. Q. How big were those branches that you say were bare? A. Well, I couldn't tell you exactly how big. It was a high tree and it was hard to tell from such a distance. Q. Will you state to the court and jury what the condition of the branches of this tree was? A. Yes; the lower branches had some leaves, some foliage, but the upper part of the tree was all bare of any leaves. Q. Do you mean that there were dry limbs, dead limbs? A. Some of the top branches were dead."

Mrs. Bertha Corob, another witness for the plaintiffs, testified that she had noticed the big tree before the accident, and when asked what she noticed about it, she answered: "Well, I noticed that the roots were uncovered and bare. You could see the roots above the ground." She further testified, in part as follows: "Q. What did the roots look like? A. They looked like they were dead. Q. Did you have occasion to pass this tree frequently? A. Yes, sir; after water. Q. Did you notice anything else about the bark of the tree? A. No. Q. When was it that you saw these roots uncovered? A. Before the accident—about four days."

Mrs. Corob also testified that she saw the roots about half-way round the tree.

"Q. What you mean is that you saw some of the heavy roots of the tree just as they went from the tree into the ground? A. Yes. Q. Where the trunk of the tree starts out and goes down into the ground? A. Yes, sir. Q. Then you saw some of the big thick parts uncovered? A. Yes, sir; and little ones. Q. How big a space from the trunk of the tree could you see them—about six inches or a foot? A. About six inches. Q. From your observation of this tree, as you passed going to get water and back, would you say that the tree—that it was a dangerous tree and that there was any likelihood of it falling? A. Not just by looking at it, without being a wind, that is what I thought about it. Q. You couldn't tell by looking at it? A. No. Q. You passed this tree several times a day? A. Well, not so very often; maybe two times a day and maybe three. Q. You walked right under it each time you passed? A. Yes, sir. Q. You didn't think there was any danger about it when you walked under it? A. No, not just then; but when there would be a

3 D. & C.

big storm I thought there might be. What made me think that was the roots showing out of the ground. Q. Was there any time, within a month's time of this accident, that you had to walk on the other side of the road because you thought this tree too dangerous to walk under? A. No, sir."

Steve Mardo was asked about the condition of the branches of the tree, and he said "the lower branches of this tree had leaves on them, but they were kind of old-looking or yellow-colored leaves, and the top branches were bare." He also testified as follows: "Q. So you say if there was anything wrong with the tree you would have gone over to the superintendent and reported it? A. Yes. Q. If you saw anything wrong with the tree any time you would have gone over to the superintendent and reported it also? A. Yes, because I am afraid of trouble. Q. How long before the accident was it that you saw this big tree and saw that the leaves of the lower branches were yellow and some of the top branches were bare? A. Well, it was about that time when some of those workmen, or men of the company, came to cut down trees and were looking around and looking about, and all that, that I noticed that. Q. Did you say anything to anybody about them at that time? A. Of course, I couldn't have much to say about it. Q. Did you say anything? A. No."

The above is about all the testimony which relates to the condition of the tree prior to the time of the accident, and while the defendant called many witnesses who testified that they had examined this larger tree prior to the time it fell, and that it looked to be and was in a healthy condition and not decayed, either at the roots or at the top, yet, if the testimony offered by the plaintiffs is sufficient to show negligence, the case was for the jury. As said in the case of Jones v. Bland, 116 Pa. 190: "In considering the validity of a compulsory non-suit, it is the duty of the court to assume the truth of the plaintiff's evidence and deduce therefrom every reasonable inference of fact in his favor that might be drawn by a jury." And in the case of Jester v. P., B. & W. R. R. Co., 267 Pa. 10, Mr. Justice Kephart said: "We have frequently said a non-suit can be entered only in clear cases, when it is inconceivable, on any reasonable hypothesis, that a mind, desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing the evidence in the light most advantageous to the plaintiff, could determine in his favor the controlling issue in fact."

So that, in passing upon this case, it is the duty of the court to take as a verity all of the evidence that was submitted by the plaintiffs regarding the condition of the tree at and before the time of the accident, and a summing up of this evidence of the plaintiffs is to the effect that a sugar maple tree, some eighteen to twenty-four inches in diameter, was standing on a lot adjoining the plaintiffs' lot; that in the latter part of August some of the branches were bare of leaves, especially at the top, and that the leaves in the lower branches were somewhat discolored or yellow; that at the trunk of the tree, where the roots entered the ground, some of these roots which might be observed were exposed for about six inches from the trunk of the tree to where they entered the ground, and that the tops of these exposed roots looked to be dead. The plaintiffs contend that this physical condition of the tree existed for a sufficient length of time to give the defendant constructive, if not actual, notice that the tree was in a dangerous condition.

The writer of this opinion has, for many years, been an admirer of trees, and, therefore, has been a rather close observer of the different kinds of trees, especially those which grow in this neighborhood, and we are free to say that we believe it would be imposing a higher duty upon the owner of trees than the law contemplates by holding that a tree that shows a condition such as is

testified to in this case was an unsafe and dangerous tree, in so far as its coming up by the roots. In walking through the woods, or even along the highways of any suburban town where there are shade trees, many of which are sugar maples, it will be observed that there are very few of those trees but what have some dead limbs, and the majority of them have roots which are exposed and dead on top. Some of these trees expose their roots the entire way around the trunk and run out a distance of two or three feet, and yet it could not be said that they are in a dangerous condition; so that we do not believe that the condition, such as testified to here, was such as would give any one notice that this tree was likely to come up by the roots. Furthermore, there is no testimony on the part of the plaintiffs to the effect that the tree, as it stood, was in such a decayed condition as would give an ordinary prudent man notice that the thing that did happen was likely to happen; neither is there any evidence to show that the falling of this tree was due to the fact that some of the limbs on its top were dead, nor to the fact that some of its roots were "exposed and bare and looked like they were dead." In other words, there is no testimony to show that the tree gave way at the point where the testimony of Mrs. Corob shows that the roots were exposed and "looked like they were dead," for the tree did not break off at that point. When falling, the tree brought up a considerable amount of dirt with it, as was shown by the testimony of Mr. Mardo, who stated the perimeter of the roots, after the tree had fallen, was about four feet or upwards.

As we view this case, the plaintiffs offered no evidence which shows negligence on the part of the defendant, or from which a fair inference of negligence could be drawn, and, therefore, we deem it our duty to sustain the motion of the defendant for judgment non obstante veredicto.

In the case of Trout v. W. G. & M. Turnpike Road, 216 Pa. 119-124, Mr. Justice Stewart said: "But more than conjecture, even though it be reasonable, is required as a basis for recovery. The burden in such a case is always on the plaintiff to show the causal connection between the accident and the negligence alleged. This may be done by showing facts and circumstances from which the connection may be inferred by a process of rational deduction, but never by speculation."

It is a fact well known by those who are familiar with trees that they often fall or give way and come crashing down even on days that are calm and where there is nothing apparently to cause them to fall. Just what caused this tree to fall on this particular morning is purely speculative. It may have been due to a shock received at some former time by a severe storm; it may have been due to a gradual giving way of the ground surrounding its roots by reason of cultivation, or there might have been other causes, all of which are speculative; but there is no evidence in this case that because of certain limbs being dead near the top, nor because of the roots near the base of the tree appearing dead, this would give any notice whatever that the tree would likely come up by its roots, and it would not be proper to permit a jury to speculate and guess as to the cause of its falling.

Counsel for plaintiffs have cited the case of Wright v. City of Chelsea, 207 Mass. 460, 10 N. C. C. A. 330, and the case of Morency v. Village of Hudson Falls, 169 N. Y. App. Div. 702, 11 N. C. C. A. 741, and contend that these cases should rule the one before us.

A perusal of these cases indicates very clearly that they differ widely from the one before us.

The first case is where a limb fell from a shade tree. This limb had long been in a dangerous condition to defendant's knowledge. In fact, it had been

so dangerous, by reason of decay and consequent liability to be blown down by ordinary winds, as to attract attention for more than a year, and there was evidence to support the finding that it had been for a long time a dangerous tree, with no action by the city officers respecting it.

In the case before us there is not a scintilla of evidence to show that the attention of the defendant was ever called to the condition of the tree in question, although both Mr. Mardo and his wife testified that for sometime prior to the accident they had noticed that there were dead limbs in the top of the tree and that some of the leaves were dead and discolored. In fact, the testimony is to the effect that the witnesses did not believe the tree to be in a dangerous condition unless there would be a high wind-storm, and the evidence shows that at the time the tree fell there was very little wind blowing.

In the second case, the facts shown were that injuries had been sustained by the falling of a tree which was standing in the street between the curb and gutter. It appeared that the tree was dead and had the appearance of being dead for some time; that it had only a few branches on it; that when it fell it broke and shattered, and an examination of the stump where it broke showed that the wood was very rotten and that it would crumble in the hand. There was also evidence that it was hollow, and that the tree inspector, in August, before the accident in November, had requested that it be filled with cement. In affirming judgment for the plaintiff, the court held that the allegations that the defendant had full knowledge of the dangerous condition of the tree, that it could have known of the dangerous condition of the tree by the exercise of reasonable care, that the defendant negligently and carelessly allowed the tree to stand for four weeks after it obtained such knowledge, and that, by the exercise of reasonable care, it could have been removed within that time, were sufficient to justify the admission of evidence that the defects were open and obvious and capable of being discovered by the exercise of due care, or that actual knowledge of the dangerous condition of the tree was brought to the attention of the city.

One can readily see the distinction between this New York case and the one at bar, for there was both actual and constructive notice in the New York case that the tree was dangerous and that it ought to be repaired, while in this case there is no evidence of either actual or constructive notice that the tree was in a dangerous condition and was likely to come up by its roots.

We have not found a parallel case among the Pennsylvania decisions, and a careful study of the cases of other states submitted by counsel for plaintiffs, which they claim to be similar to the one at bar, has failed to convince this court that a property holder should be held guilty of negligence when a tree comes up by the roots, just because a short time before it fell some one had discovered some dead limbs on its top, and some roots which were exposed six inches from its trunk "looked like they were dead." If we were to so hold, perhaps one-half of the shade trees along the streets, as well as many of the fruit trees on adjoining lots, would have to be cut down by reason of such minor signs of decay.

There are cases, no doubt, where the signs of decay in a tree are so pronounced by the falling of limbs and the rotting of its trunk, as indicated in the New York case, supra, as to give a reasonably prudent man notice that it is in a dangerous condition and liable to fall to the injury of some one, and when such defects are patent, it is the duty of the owner to remove or cut it down; but if the defects are latent, or if, as in this case, the tree gives way and comes up by the roots, the owner would not be guilty of negligence by reason of his failure to cut down such a tree.

Mardo v. Valley Smokeless Coal Company.

The case of Sheets v. Electric Ry. Co., 237 Pa. 153, perhaps is the nearest Pennsylvania case in facts to this case at bar. In that case the plaintiff was injured by a limb which fell from a large oak tree which stood in defendant's pleasure park, to which he had gone as a passenger on one of defendant's cars. The judge permitted the case to go to the jury, and later entered judgment for the defendant n. o. v. In his opinion Judge Auten said in part: "Of course, the decayed condition was obvious after it had fallen, but there is not a scintilla of testimony tending to show that such condition was observable while it was attached to the tree; nor is there any evidence from which such inference could have been drawn."

In the case before us there is not a scintilla of evidence to show that the tree which fell was in such a condition that it was liable to come up by its roots; nor is there any evidence from which such inference could have been drawn. In fact, there is no evidence tending to show that, even had the defendant made the most careful inspection, he could have discovered that the tree was in such a physical condition that it would likely give way and come up by its roots and fall at a time when there was but a "light wind blowing." In fact, the only way that the defendant could have known that, if discoverable at all, would have been by digging under the tree and examining its roots, and this it was not required to do.

Therefore, having come to the conclusion that there was no evidence of negligence on the part of the defendant, we sustain the defendant's motion for judgment non obstante veredicto.

From H. W. Storey, Jr., Johnstown, Pa.